GREGORY H. ABESON AND ARLINE H. ABESON, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Abeson v. Commissioner
Docket Nos. 19577-81; 16381-82; 16504-82; 14410-82; 16463-82; 18015-82
United States Tax Court
T.C. Memo 1990-190; 1990 Tax Ct. Memo LEXIS 210; 59 T.C.M. (CCH) 391; T.C.M. (RIA) 90190; April 11, 1990
John H. Wegge, for the petitioners. Ross Paulson, Monica Melgarejo, and John Kent, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: This case was heard by Special Trial Judge Peter J. Panuthos pursuant to the provisions of section 7443A of the Code. [2] The Court agrees with and adopts the Special Trial Judge's opinion, which is set forth below. *211 OPINION OF THE SPECIAL TRIAL JUDGE FINDINGS OF FACT PANUTHOS, Special Trial Judge: Respondent issued statutory notices of deficiency in these consolidated cases which determined deficiencies in petitioners' Federal income taxes as follows: Docket
Addition
Petitioners
No.
Year
Deficiency
Sec. 6651(a)
Sec. 6653(a)
Gregory R. Abeson &
19577-81
1974
$  1,070.90
--
$ 54
Arline H. Abeson
1975
$    929.10
--
$ 46
Gregory H. Abeson &
14410-82
1978
$  1,235.00
--
--
Arline H. Abeson
1979
$  1,307.00
Stanley Downs &
16381-82
1976
$  3,297.00
--
--
Janae Downs
1977
$  3,374.00
--
--
1978
$  1,684.00
--
--
1979
$  9,339.00
--
--
1980
$ 10,001.50
--
--
Thomas A. Duffy &
16463-82
1975
$  2,901.00
--
--
Ann D. Duffy
1976
$  3,776.00
--
--
1977
$  5,253.00
--
--
1978
$  8,722.00
--
--
1979
$  7,076.00
--
--
1980
$  5,039.00
--
--
Robert Pease &
16504-82
1975
$  3,034.00
--
--
S. Madalene Pease
1976
$  4,165.00
--
--
1977
$  4,137.00
--
--
1978
$  5,615.00
--
--
1979
$  9,231.06
--
--
1980
$ 13,622.69
$ 250.60
--
Delores P. Rivera
18015-82
1976
$  1,954.00
--
--
1977
$  3,144.00
--
--
1978
$  5,283.00
--
--
1979
$  5,920.00
--
--
1980
$  5,408.00
--
--
*212 Date
Notice of
Deficiency
Petitioners
Issued
Gregory H. Abeson &
4/15/81
Arline H. Abeson
Gregory H. Abeson &
4/14/82
Arline H. Abeson
Stanley Downs &
4/9/82
Janae Downs
Thomas A. Duffy &
4/7/82
Ann D. Duffy
Robert Pease &
4/7/82
S. Madalene Pease
Delores P. Rivera
4/14/82
These dockets have been selected by counsel for the parties as representative of various fact patterns involving a much larger group of cases. Counsel for the parties have executed a stipulation with respect to test case selection wherein they agreed to litigate common issues in these representative cases. Counsel further agreed to execute stipulations to be bound with respect to those cases not consolidated as part of the test group. History of the Litigation
During 1981 and 1982, respondent issued more than 300 notices of deficiency to individuals who were clients of the law firm of Berg & Allen (Berg & Allen or the Firm) in Los Angeles. Respondent determined in the notices that petitioners were not entitled to losses, carryback losses, and investment credits generated by investments in various limited partnerships created to acquire and distribute *213 master recordings. More than 300 petitions were filed in response to the notices of deficiency. A pre-trial hearing was held in these cases in February 1985 for the purpose of selecting a test case or cases. At that hearing the Court heard from a number of attorneys representing some of the more than 300 petitioners. Counsel advised the Court of the many preliminary problems existing which were an impediment to setting these cases for an early trial. On October 25, 1985, the Court ordered all discovery be completed by February 10, 1986. Despite the Order of October 25, 1985, the Court, recognizing some of the rather complex factual and logistical problems in these cases, considered petitioners' motions to compel discovery filed March 31, 1986. After additional preliminary hearings, the Court on May 11, 1987, issued Orders and Memoranda Sur Order relating to petitioners' interrogatories and request for documents. The Memoranda Sur Order dealt with issues of respondent's objections, including relevancy, Grand Jury, and certain privileges. The Court ordered respondent to comply with the discovery requests except to the extent petitioners sought Grand Jury information which *214 was not available to respondent's counsel. The Court also scheduled a further hearing in order to allow respondent to provide in camera responses with respect to certain documents to which respondent claimed a privilege. In the Orders dated May 11, 1987, the Court ordered respondent to turn over many documents to petitioners. Numerous documents were turned over to petitioners as a result. At the hearing held on June 18, 1987, respondent provided some documents to the Court in camera. In an Order dated August 18, 1987, the Court protected 13 groups of documents from disclosure. This litigation has also been the subject matter of other pretrial motions and a number of preliminary opinions. See for example Naftel v. Commissioner, 85 T.C. 527 (1985); Rosenberg v. Commissioner, T.C. Memo. 1985-514; Cornick v. Commissioner, T.C. Memo. 1985-513. In March 1986 the parties executed Stipulations With Respect to Test Case Selections. The stipulation stated as follows: Petitioners and respondent, through their respective Counsel, hereby stipulate and agree: 1. These cases are part of a group of approximately 325 cases *215 referred to as the "Berg and Allen group" which have been assigned to Special [sic] Judge Panuthos for handling. 2. The petitioners' counsel is the counsel of record in approximately 210 of the Berg and Allen group of cases. 3. The petitioners and the respondent agree that a common issue remaining which requires a decision by the Court in these cases involves whether or not the petitioners actually or constructively received the refund checks that were issued by the respondent to the petitioners for the taxable years at issue in this case (hereinafter referred to as the refund check issue). 4. The petitioners and the respondent have agreed that there will be the following four categories of test cases: a. Those cases where the taxpayers signed a Form entitled "Verification of Funds or Verification of Return and Receipt" and a Form 1045 or Form 1040X. b. Those cases where the taxpayers signed a document entitled "Verification of Funds or Verification of Return and Receipt" and Charles Berg or a member of the law firm of Berg and Allen signed a Form 1045 or Form 1040X. c. Those cases where the taxpayers did not sign a document entitled "Verification of Funds or Verification *216 of Return and Receipt" but the taxpayers did sign the Form 1045 or Form 1040X. d. Those cases where the taxpayers did not sign a document entitled "Verification of Funds or Verification of Return and Receipt" and Charles Berg or a member of the law firm of Berg and Allen signed a Form 1045 or Form 1040X. e. Those cases where the taxpayer signed the " Verification of Funds or Verification of Return and Receipt" and the Form 1045, Form 1040X or Form 1040 is lost or unsigned. f. Those cases where one or more government refund checks can not be located. 5. The petitioners and the respondent agree that all of the 210 cases of which John Wegge, Esq. is the counsel of record can be grouped into the four categories [sic] set forth in paragraph 5. [sic] above. 6. Selection has been made of at least one case in each of the four [sic] aforementioned categories by the parties. 7. The petitioners' counsel and respondent's counsel are filing a motion to consolidate the cases set forth herein for trial, briefing and opinion concurrently with this stipulation. 8. The petitioners and respondent agree that the parties will sign and file with the Court a stipulation to be *217 bound with respect to all the cases represented by the petitioners' counsel which are not part of the motion to consolidate filed concurrently herewith. Based on the representations in the stipulations, the Court consolidated two groups of cases. By orders dated January 7, 1988, the two groups of cases were set for trial for June 14, 1988. One group is the instant six dockets [3] in which petitioners are represented by Wegge. The second group consisted of nine dockets in which petitioners were represented by attorneys Cole and Moore. The two groups of cases were called for trial on June 14, 1988. With respect to the group of petitioners represented by attorneys Cole and Moore, the parties advised that settlement negotiations were in progress. The Court permitted the parties some time to work out the details and in fact the parties did ultimately report a basis of settlement a few days later. With respect to the instant group of petitioners represented by Wegge, the parties commenced settlement discussions. On June 21, 1988, Wegge retained additional counsel Michael Jay Berger and Steven *218 R. Stolar to assist with the litigation. [4] When it became clear that a settlement could not be reached, petitioners' counsel requested the cases be continued. As a basis for continuance, attorney Berger advised the Court that Wegge was relying on attorneys Cole and Moore in the trial of the other group of petitioners and the settlement of those cases would require a reorganization and a new strategy for the trial in the instant cases. Despite the fact these cases were set for trial some 6 months earlier, the Court allowed petitioners an additional 2 weeks until July 5, 1988, to prepare for trial. The trial commenced on July 5, 1988, proceeded through one more adjournment, and was concluded on September 29, 1988. There are approximately 3,000 pages of transcript, not including the hundreds of pages relating to pretrial proceedings. There are more than 400 separate stipulations of fact as well as in excess of 800 exhibits received in evidence. Because of this massive record, the Court very clearly advised the parties of the importance of briefs. The Court reminded counsel of the requirement *219 that specific requests for findings of fact be made. Since the primary issues raised by petitioners were outside the scope of the notice of deficiency, the Court initially ordered seriatim briefs, petitioners to file an opening brief on or before December 28, 1988. Rather than file a brief, by letter dated December 4, 1988, Wegge asked for a stay of the briefing schedule in order to identify alleged perjured testimony at trial. By order dated December 16, 1988, the Court gave Wegge until January 25, 1989, to present his specific allegations and the Court temporarily stayed the filing of briefs. By letter dated January 18, 1989, Wegge presented conclusory allegations of alleged perjury. By order dated January 27, 1989, the Court found Wegge's claims were not sufficiently specific and otherwise without merit. The Court ordered the parties to file simultaneous opening briefs on or before March 20, 1989, and reply briefs on or before May 5, 1989. The Court cited the case of Stringer v. Commissioner, 84 T.C. 693 (1985), affd. in an unpublished opinion 789 F.2d 917 (4th Cir. 1986), advising counsel of the importance of briefs. On March 13, 1989, counsel *220 for petitioners, Berger, Stolar, and Livington, moved to withdraw. They alleged as a basis for withdrawal the nonpayment of fees by Wegge and disagreement as to the procedures used by Wegge. The Court granted the motion on April 13, 1989. Meanwhile, on March 20, 1989, respondent's opening brief was filed. On March 22, 1989, Wegge filed a Motion for Recusal of Tax Court Judge. By order dated March 24, 1989, the Court denied petitioners' motion. The Court gave petitioners until March 31, 1989, to file an opening brief. The Court further ordered: That the time for filing petitioners' opening brief shall not be further extended regardless of other motions or pleadings filed by petitioners. If counsel for petitioners fails to comply with this order, petitioners and their counsel may be subject to sanctions. Petitioners' opening brief was filed on April 5, 1989 (mailed timely). Petitioners' brief cites two cases, sets forth three issues, and contains six one-sentence requests for findings of fact. The brief is 21 pages in length. Respondent's reply brief was filed on May 16, 1989. When no reply brief was filed by petitioners, the Court on June 23, 1989, closed the record. *221 On July 3, 1989, petitioners filed a motion to hold respondent in default. The Court denied petitioners' motion on July 11, 1989. The Issues to be Decided
Determining the issues remaining in dispute is not a simple matter in these cases. Counsel for petitioners has sporadically argued various issues and positions. Based on the discussion that follows, we find that the issues for decision in this case are as follows: 1. Substantive issue: Whether, for purposes of determining the amount of deficiencies or overpayments, petitioners should be considered to have received refund checks in care of Berg & Allen and negotiated by Berg & Allen. 2. Procedural issues: (a) Whether respondent improperly utilized grand jury information in the determination of petitioners' Federal income tax liabilities. (b) Whether respondent complied with orders of the Court compelling discovery. Background Relating to the Issues
Petitioners raised three substantive issues in their petitions as follows: (1) Whether petitioners are entitled to deductions and credits in connection with master recording partnerships. (2) Whether petitioners are entitled to various miscellaneous *222 deductions. (3) Whether petitioners should be treated as having received refund checks. Petitioners conceded the first issue raised in their petitions in the stipulation of facts. While petitioners presented some evidence on the issue of miscellaneous deductions, petitioners did not present any request for findings of fact or any argument on brief with respect to these issues. The third issue, the question of receipt of refund checks, has been the primary focus of this litigation. Yet, despite the clear unequivocal direction of the Court, the many pages of transcript, and hundreds of exhibits, petitioners devote possibly two or three sentences in a request for findings of fact and present one and one-half pages of argument on this issue. Prior to and during trial, various procedural issues were raised. On brief petitioners request findings of fact and present argument with respect to two procedural issues. The first is whether respondent improperly utilized grand jury information in the determination in these cases and, secondly, whether respondent withheld documents in the discovery process. *223 Rule 151(a) provides in part "Briefs shall be filed after trial or submission of a case, except as otherwise directed by the presiding Judge. [Emphasis added.]" Further, Rule 123(b) provides, upon failure of a party to comply with the rules or an order of the Court, the Court may decide against any party on any issue as to which such party has the burden of proof. In Stringer v. Commissioner, supra at 708, we held the taxpayer's failure to file a brief fully justified a dismissal of all issues as to which the taxpayers had the burden of proof. As in Stringer v. Commissioner, supra, the Court here gave petitioners' counsel a clear directive as to the need for and importance of briefs. The Court in two separate orders cited Stringer v. Commissioner, supra, advising of the requirement of briefs. Despite these admonitions, Wegge submitted his 21-page opening brief only after considerable delay. The brief fails to request findings of fact as to some issues despite the extensive record. The brief further fails to present argument on issues raised at trial. In short, petitioners' brief is virtually useless to the *224 Court. Additionally, petitioners failed to file a reply brief. Based on this background, we deem all matters not argued by petitioners in their brief upon which petitioners have the burden of proof to be conceded. Stringer v. Commissioner, supra. The issue relating to the deductions and credits for investment in master recording partnerships was conceded by stipulation. The issues relating to petitioners' entitlement to various miscellaneous deductions including tax preparation fees were not argued on brief by petitioners and, accordingly, are deemed conceded except to the extent certain adjustments were otherwise conceded by respondent or depend upon the resolution of the main issue. The issue whether petitioners should be treated as having received refund checks has been the primary issue of this litigation. While petitioners' brief is of little assistance in untangling this massive record, we recognize one of the purposes of this litigation was to provide a test vehicle for many similarly situated taxpayers. We will thus decide this issue on the record before us to avoid the necessity of further litigation by other similarly situated taxpayers. *225 We will also consider the two procedural issues raised by petitioners on brief and deem other procedural issues not argued on brief by petitioners to be waived. General Facts
(a) The "Investment Plan"
During the years 1977 through 1981, petitioners engaged Berg & Allen to prepare their income tax returns. At one of the initial meetings between petitioners and representatives of the Firm, attorney Charles Maxwell Berg (Berg) made a presentation to petitioners outlining an investment plan. Berg, as part of his presentation to petitioners, described how his tax shelter investment plan would enable petitioners to recover large amounts of taxes previously paid with respect to prior years' returns. Pursuant to the plan, petitioners invested in various master recording limited partnerships. Some petitioners wrote personal checks payable for their cash investment. Petitioners also executed nonrecourse promissory notes. Pursuant to the agreement of petitioners and Berg, the personal checks were not cashed, but rather held by Berg. It was understood by petitioners the partnership investment would be funded by the tax refunds generated by the credits and deductions claimed *226 from the investment. The Firm would then prepare and file the partnership returns, the individual returns, and claims for refund for carryback losses. The partnership returns reported large operating losses from claimed depreciation deductions and investment tax credits. The parties now agree the deductions and credits claimed are not proper and are not allowable. Thus the individual returns and claims for refund were based upon improper deductions and credits. All the individual returns and claims for refund reflected petitioners' names c/o Berg & Allen with the address of the Firm. Refund checks in most instances were sent to the address reflected on the returns. When the refund checks were received by Berg and Allen, petitioners were contacted and advised of the receipt of the refund. In some instances petitioners endorsed the refund checks. In other instances the Firm signed petitioners' names or stamped the back of the check with the Firm's name. The refund checks were then deposited into the Firm's bank account. Berg & Allen deposited millions of dollars from petitioners' refunds to the Firm's bank accounts during the period 1979 through early 1981. The Firm then *227 applied the funds to pay petitioners' investment and tax preparation fees. A Firm check for the balance was issued to each petitioner. Sometimes Berg retained a commission up to 50 percent of the amounts invested. Some petitioners may not have been aware that Berg sometimes retained a commission. During April 9, 1980 through June 26, 1980, Berg & Allen wrote checks to petitioners totalling over 1.2 million dollars. Elaborate records were kept by the Firm reflecting the disposition of the funds. (b) The Processing of Refunds by the IRS
In order to process refunds, agents of the Internal Revenue Service (IRS) send vouchers for payment on magnetic tape to the Financial Management Service (FMS), which is part of the Treasury Department. The FMS is responsible for issuing Government checks on behalf of almost all Government agencies. During 1979 approximately 70 million refund checks were issued by FMS for the IRS. The IRS does not have authority to issue refund checks directly to taxpayers. The IRS certifies to the FMS that a tax refund check should be made to a particular taxpayer and sent to a particular address. The FMS follows the instructions provided by the IRS. *228 In the event a taxpayer does not receive a tax refund check, the taxpayer can contact the IRS and obtain a form to certify that he or she did not receive the refund check and indicate whether the check was lost, stolen, or destroyed. The taxpayer must also indicate whether he or she believes the check was endorsed. After examining a copy of the check, if the taxpayer still believes the check was not received, he or she can file a claim with the FMS for the proceeds of the check. If the FMS determines the check was not cashed, a new check may be issued. If the check was cashed, the Adjudication Division of the FMS (formerly known as the Division of Check Claims) will consider the circumstances of the claim and make a determination as to whether a replacement check should be issued. The circumstances of when a replacement check will be issued are governed by 31 U.S.C. 3343(b). None of the petitioners filed claims with the FMS concerning their refund checks. (c) The Questionable Return Program (QRP)
During the years in issue the IRS Service Centers maintained a program to intercept fictitious returns claiming refunds. The program was known as the *229 questionable return program (QRP). The criteria as to how the IRS selects returns that may be fictitious are not disclosed. The purpose of the QRP program is to prevent the issuance of refunds from the filing of fictitious returns containing nonexistent social security numbers. When a tax return is identified as fictitious, the Service Center will attempt to prevent a refund from being issued. During the years in issue many of the Berg & Allen prepared returns were identified by the QRP program. The identification likely occurred because of an identical address appearing on hundreds of returns. The 1977 through 1980 returns were so identified. However, even though the returns were initially identified, no action was taken to stop refunds from being issued because the Berg & Allen prepared returns were not fictitious returns which was the subject matter of the QRP program. During 1978 and 1979, there were ongoing civil and criminal investigations of Berg. Thus, when some of the Berg & Allen client returns were identified by the QRP team, information concerning the QRP identification was forwarded to either the Criminal Investigation Division or the Examination Division of *230 the IRS. It was not the function of IRS employees in the QRP program to examine the tax returns or powers of attorney. (d) Examination of Petitioners' Returns and Claims for Refund
Berg & Allen was not unfamiliar to the IRS since Berg was previously under criminal investigation with respect to the 1972 and 1973 tax years. The investigation involved aiding and assisting in the preparation of false, fraudulent tax returns. In 1978 and 1979, some of petitioners' returns were identified by the QRP and forwarded to the Criminal Investigation Division and the Examination Division for further investigation. In late 1979 or early 1980, Alice Ford Polser (Polser), an employee of the IRS working as a coordinator of the Return Preparer Program, became aware of the Berg & Allen cases. Mrs. Polser became the coordinator of the Berg & Allen project in the fall of 1980. That project was designed to examine all the individual returns prepared by Berg & Allen. The field office branch was assigned the job of examining the partnership returns prepared by Berg & Allen. Initially, the IRS sent examination letters to Berg & Allen based on the powers of attorney attached to the returns. *231 As a general matter, the IRS did not receive any responses to the initial examination letters. When responses were received, the IRS received little cooperation from Berg & Allen. As early as February 1980, the IRS determined to bypass Berg pursuant to section 601.105(b), Statement of Procedural Rules, and sent a letter to petitioners and the Firm notifying them of the IRS' determination. [5] The purpose of the bypass letter was to advise both petitioners and their representatives that the IRS intended to deal directly with petitioners. Initially, the IRS continued to send copies of correspondence to petitioners' representatives. Berg & Allen ceased doing business on or about August 31, 1981. The IRS stopped sending copies of any notices to Berg & Allen when it learned the Firm was out of business. Mrs. Polser coordinated her efforts with other employees in the IRS. While she met with special agents and knew of the existence of a potential Grand Jury proceeding, she was not given any documents which were the subject matter of the Grand Jury proceeding, *232 nor was she given any information concerning the content of any proceedings in the Grand Jury. However, she was advised it would be inappropriate to proceed against Berg with respect to any preparer penalties, or with any injunctive action, because of the ongoing criminal investigation. Thus, while Mrs. Polser accumulated information, she did not proceed with respect to any preparer penalties. Since there was generally little response from the taxpayers or their representatives to inquiries from the IRS, respondent ultimately issued notices of deficiency in 1981 and 1982. Most of the individual returns had powers of attorney attached designating Berg as petitioners' attorney in fact. Many of the powers of attorney had additional language inserted authorizing Berg to "endorse and collect checks for taxpayer(s) in any state, federal or other matters." The powers of attorney were not always treated consistently by employees of the IRS. Some were treated as invalid because of the inserted language. Others were considered only partially invalid. Some amended powers of attorney were not noticed or were ignored. Service centers also treated the powers of attorney differently. The *233 Fresno Service Center sent refunds to some petitioners in care of the Berg & Allen address reflected on the return. In a few instances, other service centers sent refunds to the address reflected on some petitioners' Form W-2 attached to the return, determining not to send the refunds to the Berg & Allen address. In late 1980 and early 1981, the IRS coordinators of the Berg & Allen project became increasingly aware Berg & Allen prepared returns claimed improper deductions. The IRS was also concerned Berg might be cashing petitioners' refund checks without their consent. In March 1981, the IRS Assistant Commissioner for Compliance approved a "pre-refund examination" of all returns prepared by Berg & Allen. Thus, refund checks would no longer be issued without an examination of the return. Ultimately, a freeze was put in place and refund checks for the 1980 tax year, to be issued in 1981, were frozen and not sent to Berg & Allen or to the taxpayers. (e) The Seizure of Berg & Allen Client Files
On September 3, 1981, agents for the IRS and Secret Service searched the law offices of Berg & Allen pursuant to a search warrant. Among the items authorized to be seized were: *234 a) Documents and records relating to the sale by Charles Berg or other employees of Berg & Allen of master recording tax shelters to the taxpayers. b) Documents and records relating to the receipt, deposit and negotiation of United States Treasury checks which included: Accounting files, books and records and copies of or original United States Treasury checks. According to the inventory of property seized, at least 98 boxes of records were taken from the offices of Berg & Allen. Boxes and records were numbered so the exact location from where particular records were taken could be ascertained. The records were taken to 1625 North Hudson Street, Hollywood, California. and stored in the basement of the Federal building. Robert Hessler, a special agent for the IRS, supervised the seizure and the inventory process. (f) Criminal and Grand Jury Investigations
In late 1975 respondent wrote a letter to the Department of Justice recommending Berg be prosecuted under section 7206(2) for aiding and assisting in the preparation of three false and fraudulent tax returns for 1972 and 1973. In 1976 the Department of Justice forwarded the case to the United States Attorney suggesting *235 witnesses be examined before the Grand Jury. In February 1979, the United States Attorney advised the Department of Justice it would not proceed with a prosecution of Berg for the 1972 and 1973 years. However, the United States Attorney asked for authorization to extend the scope of a Grand Jury investigation for possible violations for the 1974 through 1977 years. This request was based on a further investigation by IRS agents made at the request of the United States Attorney. The request to extend Grand Jury authorization was apparently declined by the Department of Justice. In early 1980, Special Agent Hessler became involved in the investigation of Berg. In June 1980, the special agent recommended to the Chief, Criminal Investigation Division that a Grand Jury investigation be authorized against Berg for violations under section 7206(2) for the taxable years 1977, 1978, and 1979. The prosecution recommendation was ultimately forwarded to the IRS National Office. In September 1981, the IRS National Office advised the Criminal Investigation Division in Los Angeles the request for Grand Jury authorization would be declined. Meanwhile in May 1981, the United States Attorney *236 requested the IRS seek a Grand Jury investigation. The record is not clear whether Berg was a target of an existing Grand Jury initially or whether he later became a target of the Grand Jury. A special agent of the IRS was called as a witness before a Grand Jury on September 30, 1981. In late October 1981, the United States Attorney again requested assistance of the IRS in a Grand Jury proceeding. On February 3, 1982, the Assistant Attorney General, Tax Division, Department of Justice, approved the participation of the IRS in the Grand Jury investigation of Charles Berg. A special agent of the IRS recommended the prosecution of Berg in a report made in March 1983. The special agent, and other persons with access to Grand Jury information, recognizing the prohibition set forth in Rule 6(c), Federal Rules of Criminal Procedure, did not provide the IRS Examination Division with documents or information which were the subject matter of the Grand Jury. Berg fled the country and became a fugitive from justice. The parties have assumed Berg was the subject of a secret indictment; however, there is no evidence of this in the record. On June 9, 1988, counsel for respondent obtained *237 an order pursuant to Rule 6(e) of the Federal Rules of Criminal Procedure from the United States District Court permitting limited access to Grand Jury information. While counsel for petitioners were provided access to Grand Jury information just prior to trial, petitioners' counsel did not offer a copy of an order under Rule 6(e), Federal Rules of Criminal Procedure. Specifics as to Each Petitioner
(a) Gregory H. and Arline Abeson
Petitioners Gregory and Arline Abeson (the Abesons) were clients of Berg & Allen. The Abesons became partners in the Iroqua partnership for the 1977 taxable year. They reported a basis in Iroqua of $ 2,000 and claimed depreciation deductions for 1977, 1978, and 1979. The Abesons also claimed an investment tax credit in Iroqua for 1977 in the amount of $ 2,000. The unused portion of the investment credit was carried back to 1974 and 1975 by filing Forms 1040X and 1045. The Abesons executed a power of attorney (Form 2848) on January 25, 1978, in favor of Berg for the taxable years 1974 through 1978. The power of attorney contained language that Berg was authorized "To endorse and collect checks for [the Abesons] in any state, federal *238 or other matters." A power of attorney (Form 2848) was also executed by the Abesons on January 13, 1979, in favor of Berg for taxable years 1975 through 1979. This power of attorney contained the same language as the one signed in 1978. A virtually identical power of attorney was again executed by the Abesons on January 14, 1980, for the taxable years 1975 through 1980. While the Abesons wrote a check to Berg & Allen on December 17, 1977, for $ 1,750, the check was never cashed. The Abesons' investment in the Iroqua partnership was $ 1,750 and was funded by the refund checks received by Berg & Allen. Refund checks were sent to the Abesons at the Berg & Allen offices and received and endorsed as follows: Date
Year
Amount
Endorsed By
Oct. 8, 1982
1974
$ 1,676.47
Abesons
Oct. 8, 1982
1975
$   167.52
Abesons
Apr. 13, 1979
1978
$ 3,009.00
Abesons
Apr. 18, 1980
1979
$ 3,314.00
Berg & Allen
The books and records of Berg & Allen reflected the following information: Amounts Refunded
$ 1,125.00
1977 Federal Return
$   158.00
1977 State Return
$   973.13
1974 Federal Return
$   959.36
1975 Federal Return
$ 3,215.49
Total Refunds
*239 Application of Refunds
$ 1,750.00
Investment in Iroqua Partnership 250.00
Tax Preparation Fee to Berg
$ 2,000.00
$ 3,215.49
Refunds 2,000.00
Amount Applied
$ 1,215.49
Return to Client
When refund checks were received by Berg & Allen, the Abesons executed a form prepared by Berg & Allen entitled "Verification of Receipt of Funds." The language contained on the form stated as follows: The undersigned verifies and certifies that the refund check that the taxpayer received, along with a copy of this Verification and Receipt is true and correct less any amount due Berg & Allen. In any case where Berg & Allen has negotiated checks for and on behalf of the taxpayer, the undersigned expressly acknowledges, verifies and affirms that specific authority and permission has been granted to Berg & Allen by the undersigned and that all such transactions took place pursuant to the said authority. The Abesons also executed a form with respect to the 1979 taxable year entitled "VERIFICATION OF RETURN" which stated as follows: The undersigned taxpayer hereby verifies under penalty of perjury that the tax return *240 (540, 1040, or other), prepared by Berg & Allen, Inc. for the year 1979 has been prepared to the undersigned's satisfaction: That they have received a copy of the same and reviewed it, and find all the facts and figures contained therein to be true and correct; further, that they supplied each and every piece of information to the firm of Berg & Allen, either in writing or orally at the time the tax return was prepared; that they have authorized the firm of Berg & Allen to represent them in any matters pertaining to their tax returns, including but not limited to authorizing the firm to sign the return on their behalf at their specific insistence and direction. With respect to the 1978 taxable year, petitioner Arline Abeson executed a form entitled "VERIFICATION OF RETURN AND RECEIPT." The form provided as follows: The undersigned taxpayer hereby verifies under penalty of perjury that the tax return (540, 1040, or other), prepared by Berg & Allen, Inc. for the year 78 has been prepared to the undersigned's satisfaction: That they have received a copy of the same and reviewed it, and find all the facts and figures contained therein to be true and correct; further, that they *241 supplied each and every piece of information to the firm of Berg & Allen, either in writing or orally at the time the tax return was prepared; that they have authorized the firm of Berg & Allen to represent them in any matters pertaining to their tax returns, including but not limited to authorizing the firm to sign the return on their behalf at their specific insistence and direction. The undersigned further verifies and certifies that the refund check that the taxpayer received, along with a copy of this Verification and Receipt is true and correct less any amounts due Berg & Allen. In any case where Berg & Allen has negotiated checks for and on behalf of the taxpayer, the undersigned expressly acknowledges, verifies, and affirms that specific authority and permission has been granted to Berg & Allen by the undersigned and that all such transactions took place pursuant to the said authority. The Firm sent checks to the Abesons for a lesser amount than the total 1978 and 1979 refunds. The difference represented tax preparation fees to Berg & Allen. A tax preparation fee of $ 550 was deducted from refund checks received in 1979. Respondent agrees that the Abesons are entitled *242 to claim tax preparation fees as claimed if the Court finds for respondent on the main issues. The Abesons concede they are not entitled to any claimed deductions or credits by reason of their investment in Iroqua. (b) Stanley and Janae Downs
Stanley and Janae Downs (the Downses) were also clients of Berg & Allen. They first met with Berg in March 1979. Petitioner Stanley Downs was a manager in the data processing department of Continental Airlines. The Downses became partners in the Pescadero partnership in 1979. The Downses reported a basis of $ 120,000 in Pescadero and claimed depreciation deductions on the 1979 Federal income tax return. They also claimed a $ 12,000 investment credit for 1979, $ 5,329 of which was applied against their 1979 Federal income tax liabilities. The unused portion ($ 6,671) was carried back in an application for tentative refund for 1976 and 1977. The Downses executed a power of attorney (Form 2848) on March 6, 1979, in favor of Berg for the taxable years 1975 through 1980. The power of attorney contained language identical to that contained in the powers of attorney executed by the Abesons. An identical power of attorney was executed *243 by the Downses on February 4, 1980. In order to fund the investment in Pescadero, the Downses wrote a check for $ 12,000 and executed a promissory note for $ 108,000 to Berg and Allen. Berg represented and the Downses understood the $ 12,000 check would not be negotiated and no attempts would ever be made to collect on the promissory note. It was further agreed the Downses' investment in Pescadero would be funded by the tax refunds generated by the claimed deductions and credits. Refund checks were sent to the Downses at the Berg & Allen offices. The checks were received and endorsed as follows: Date
Year
Amount
Endorsed By
May 4, 1979
1976
$    79.08
Downs
Aug. 22, 1980
1976
$ 3,524.63
Berg & Allen
Aug. 22, 1980
1977
$ 3,606.95
Berg & Allen
May 11, 1979
1978
$ 1,199.00
Downs
Apr. 25, 1980
1979
$ 7,758.00
Berg & Allen
The books and records of Berg & Allen reflected the following information: Amounts Refunded
$  7,758.00 1979 Federal Return
756.00 1979 State Return
3,524.63 1977 Amended Federal Return
3,606.95 1976 Amended Federal Return
$ 15,645.58
Application of Refunds
$ 12,000.00 Investment in Pescadero
2,190.00 Tax Preparation Fee to Berg
1,455.58 Return to Client
$ 15,645.58 Total Application of Funds
*244 The refund checks were deposited into Berg & Allen's bank account. Petitioner Janae Downs executed a form entitled "VERIFICATION OF RETURN AND RECEIPT" which is identical to the form executed by the Abesons. She also executed a form entitled "VERIFICATION OF RETURN" identical to the Abesons'. The Downses concede they are not entitled to any claimed deductions or credits by reason of their investment in Pescadero. Respondent concedes that the Downses are entitled to certain claimed interest deductions. (c) Thomas A. and Ann D. Duffy
Petitioners Thomas A. and Ann D. Duffy (the Duffys) were also clients of Berg & Allen. Petitioner Thomas A. Duffy was a telephone repairman during the years in issue. He learned about Berg through his co-workers and first went to see Berg in January 1979. The Duffys became partners in the Copam partnership during the 1978 taxable year. The Duffys reported a basis in Copam of $ 200,000 and claimed depreciation deductions for 1978, 1979, and 1980. They also claimed investment tax credits from Copam for 1978 and claimed investment credit carrybacks to 1975, 1976, and 1977. The petitioners also carried forward from 1978 unused investment *245 tax credits to their 1979 return. The Duffys executed a power of attorney previously identified on February 25, 1979, in favor of Berg for taxable years 1975 through 1980. The power of attorney contained language identical to that contained in the powers of attorney executed by the Abesons. Another power of attorney in favor of Ronald Allen (Allen) was executed on March 24, 1980, by petitioner Thomas A. Duffy. This power of attorney also provided the attorney in fact could endorse and collect checks. The Duffys wrote a check to Berg & Allen in the amount of $ 17,500. The check, written in early 1979, was dated December 31, 1978. Pursuant to the agreement, the check was not cashed. The Duffys' investment in Copam was $ 17,500 and was funded by tax refunds received. The tax refunds were generated by the depreciation deductions and investment credits claimed. Refund checks were sent to the Duffys at the Berg & Allen offices. The checks were received and endorsed as follows: Date
Year
Amount
Endorsed By
Sept. 14, 1979
1975
$ 3,018.95
Berg & Allen
Sept. 14, 1979
1976
$ 3,929.52
Stamped Berg & Allen
Sept. 14, 1979
1977
$ 5,466.57
Stamped Berg & Allen
Aug. 17, 1979
1978
$ 8,918.00
Berg & Allen
*246 The Berg & Allen records reflected the following: Amounts Refunded
$ 7,306.51
1979 Federal Return
1,212.00
1979 State Return
308.00
1979 Federal Return (second check)
8,918.00
1978 Federal Return
883.00
1978 State Return
5,466.57
1977 Federal Return
3,929.52
1976 Federal Return
3,018.95
1975 Federal Return
Application of Refunds
$ 17,500.00 Investment in Copam
* 1,195.00  1979 Tax Preparation Fee to Berg & Allen
1,470.00 1978 Tax Preparation Fee to Berg & Allen
950.00 1980 Tax Preparation Fee to Berg & Allen
The refund checks were deposited into Berg & Allen's bank account. When refund checks were received by Berg & Allen, the Duffys were notified and executed a "Verification of Receipt of Funds" identical to that signed by the Abesons. The Duffys also executed similar forms for other years entitled "VERIFICATION OF RETURN" and "VERIFICATION OF RETURN AND RECEIPT" identical to those executed by the Abesons. The Duffys then received a Berg & Allen check for the balance after the amount applied for their investment and for tax return *247 preparation fees. The Duffys did not complain they did not receive the correct amount of their refund. The Duffys concede they are not entitled to any claimed deductions or credits by reason of their investment in Copam. In January 1980, a special agent of the IRS came to the Duffys' home and advised them that the IRS was investigating Berg and Berg's clients. Petitioner Thomas A. Duffy called Berg & Allen and another attorney from the Firm came to the Duffys' home where a second meeting was conducted with the agent. The attorney from the Firm advised the agent that a summons should be used if the IRS wanted any information. Petitioner Thomas A. Duffy was later served with a summons. The Duffys continued to utilize the Firm's services despite their knowledge the Firm was under criminal investigation by the IRS. (d) Robert and S. Madalene Pease
Petitioners Robert and S. Madalene Pease (the Peases) were also clients of Berg & Allen. Petitioner Robert Pease is a supervisor with the Federal Aviation Administration. He first met with Berg in April 1977. Berg advised the Peases about master recording investments. They became partners in Jamfore partnership in 1978. The *248 Peases reported a basis in Jamfore on their 1978 return in the amount of $ 180,000. An investment credit of $ 18,000 was claimed and depreciation deductions were claimed on the 1978 return. The unused portion of the claimed investment tax credit was carried back to 1975, 1976, and 1977 by filing Forms 1045 and 1040X. The Peases also carried forward the unused investment credit to their 1979 and 1980 returns. The Peases executed a power of attorney on February 8, 1979, designating Berg as their attorney in fact for the taxable years 1975 through 1979. They also executed a power of attorney on March 1, 1980, designating Allen as their attorney in fact with respect to the taxable years 1975 through 1980. The Peases further executed powers of attorney on June 8, 1981, and November 21, 1981, designating John Wegge as attorney in fact for the taxable years 1974 through 1981. The Form 2848 executed on February 8, 1979, contains language with respect to the power to endorse and collect checks identical to that in the Form 2848 executed by the Abesons. The Peases' investment in Jamfore was $ 15,750 and was funded by refund checks from the 1978 return and related carryback returns. *249 The Peases initially gave Berg a blank check for their investment with the understanding it would not be cashed. Berg & Allen issued a bill of $ 2,500 for preparation of petitioners' 1978 Federal and State income tax returns. A bill was issued by Berg & Allen for $ 1,500 for preparation of petitioners' 1979 Federal and State income tax returns. Someone crossed out the amount of $ 1,500 and wrote in the amount of $ 1,000 on the copy of the 1979 bill returned and made part of the records of Berg & Allen. The Peases' tax return preparation fees for 1978, 1979, and 1980 of $ 2,500, $ 1,000, and $ 1,425, respectively, were also funded from refund checks. Respondent agrees that the Peases are entitled to the claimed tax preparation fee deductions if the Court finds for respondent on the main issue. Refund checks were sent to the Peases at the Berg & Allen office. The checks were received and endorsed as follows: Date
Year
Amount
Endorsed By
Oct. 5, 1979
1975
$ 2,380.57
Berg & Allen
Oct. 5, 1979
1976
$ 4,348.72
Berg & Allen
Oct. 5, 1979
1977
$ 4,319.48
Berg & Allen
May 25, 1979
1978
$ 6,142.00
Berg & Allen
May 9, 1980
1979
$ 8,678.00
Stamped Berg & Allen
*250 The records of Berg & Allen reflected the following: Date of Check
Tax Year
Amount
October 5, 1979
1975
$ 2,380.57
October 5, 1979
1976
$ 4,348.72
October 5, 1979
1977
$ 4,319.48
May 25, 1979
1978
$ 6,142.00
May 9, 1980
1979
$ 8,678.00
The Peases met with Berg in June 1980. Berg talked with them about investing some money in an office building. Berg told the Peases their investment would produce 2 percent interest per month. The investment was funded by the 1979 State and Federal refunds. When the refund checks were received at Berg & Allen, they were deposited into the Firm's account. The Firm then contacted the Peases in order that they could come to the Firm to receive any funds remaining after application of the refund to the yinvestment and tax preparation fees. The Peases executed Verification of Receipt of Funds forms prior to receiving any funds from Berg & Allen. These forms are identical to the one signed by the Abesons. In some cases the Peases also executed "VERIFICATION OF RETURN AND RECEIPT" and "VERIFICATION OF RETURN" identical to those executed by the Abesons. The Peases concede they are not entitled to any claimed *251 deductions or credits by reason of their investment in Jamfore. (e) Delores P. Rivera
Petitioner Delores P. Rivera (Rivera) was a communications worker at Pacific Telephone in 1978. She was told about Berg & Allen by other employees at Pacific Telephone and became a client of Berg & Allen in 1979. She became a partner in the Vallejo partnership for 1979. Rivera reported a basis of $ 120,000 in Vallejo on her 1979 return and claimed depreciation deductions for 1979 and 1980. Rivera also claimed an investment credit of $ 12,000 on her 1979 return. She also claimed investment tax credit carrybacks to 1976, 1977, and 1978. Rivera executed a power of attorney (Form 2848) on February 26, 1979, designating Berg as her attorney in fact for the taxable years 1975 through 1980. A Form 2848 was also executed by Rivera on February 20, 1980, designating Allen for the same years. Both powers of attorney contain language identical to the language contained in the Form 2848 signed by the Abesons. Rivera wrote out a check payable to Berg & Allen in 1979 for $ 12,000. Pursuant to the agreement between Rivera and Berg & Allen, the check was not cashed by Berg & Allen. In order to *252 fund the investment in Vallejo, it was understood Berg & Allen would apply tax refunds generated by the claimed deductions and credits. Rivera's $ 12,000 investment was in fact funded by her 1976 income tax refund. Refund checks were sent to petitioner at the Berg & Allen office. The checks were received and endorsed as follows: Return
Amount of Refund
Endorsement
1976 Carryback
$ 2,088.91
Berg & Allen
1977 Original return
$   758.75 Rivera
1977 Carryback
* $ 3,368.30
Berg & Allen
1978 Original return
$ 2,578.00 **
1978 Carryback
* $ 2,690.14
Berg & Allen
1979 Original return
$ 7,233.00 Stamped Berg & Allen
1980 Original return
$ 6,586.00 ***
In 1979, Berg & Allen received a refund check payable to Rivera and Berg. Rivera went to the Berg *253 & Allen offices, endorsed the check, and Berg & Allen deposited it in the Firm's account. The funds were applied by Berg & Allen for tax preparation fees and to Rivera's investment. Rivera did not receive all her refund checks in 1980 as she had anticipated and called Berg & Allen to determine where they were. She was unsuccessful in getting a response from Berg & Allen and made inquiries of the IRS. The IRS responded that her refund checks had been mailed. In November 1981, Rivera received claim forms from the IRS to make a claim for the refund checks. She did not file these forms, but rather sent them to Wegge at the firm of Berg & Allen. The claim forms were not filed. Berg & Allen charged Rivera fees for preparation of her 1978, 1979, and 1980 returns of $ 730, $ 2,200, and $ 1,250, respectively. The 1978 and 1979 tax return preparation fees were paid out of the refund checks deposited to Berg & Allen's account. The 1980 tax return preparation fee was paid by Rivera with by two personal checks. After the funding of the investment and payment of tax preparation fees, the balance of refunds were sent to Rivera by Berg & Allen. With respect to some refunds, Rivera executed *254 a form entitled "VERIFICATION OF RECEIPT OF FUNDS" identical to that executed by the Abesons. Rivera also executed a form "VERIFICATION OF RETURN AND RECEIPT" identical to that executed by the Abesons. Rivera concedes she is not entitled to any claimed deductions or credits by reason of her investment in Vallejo. OPINION 1. Should Petitioners Be Treated As Having Received Their Respective Refunds Which Were Mailed To Petitioners At The Address of Berg & Allen. Petitioners argue for purposes of determining the deficiencies or overpayments, they should not be considered to have received the refund checks sent to and negotiated by Berg & Allen. The premise of their argument is that the provision in the power of attorney executed by petitioners giving authority to Berg & Allen to endorse and collect Federal and State refund checks invalidated the entire power of attorney. Thus, petitioners argue respondent improperly sent the refund checks to Berg & Allen. Respondent argues, since Berg & Allen's name and address were reflected on the return, the refund checks were properly sent to such address. He further argues, while the provision in the power of attorney authorizing *255 Berg & Allen to endorse and collect checks may violate the Statement of Procedural Rules, the entire power of attorney is not invalidated. Respondent also points out petitioners participated in an arrangement with Berg & Allen which caused the refund checks to be sent to Berg & Allen. As part of the arrangement, petitioners received part of the proceeds of their refund checks, the balance being applied towards their investment and for tax preparation fees. We agree with respondent. Petitioners did not establish they failed to receive their refund checks as a result of respondent's failure to properly process their returns or as a result of respondent's failure to properly forward the refund checks. Section 301.6402-2(f)(1), Proced. & Admin. Regs., provides: (f) Mailing of refund check. (1) Checks in payment of claims allowed will be drawn in the names of the persons entitled to the money and, except as provided in subparagraph (2) of this paragraph, the checks may be sent direct to the claimant or to such person in care of an attorney or agent who has filed a power of attorney specifically *256 authorizing him to receive such checks. Each of the returns and claims for refund in question contained a petitioner's name and the address of the law offices of Berg & Allen. Under these circumstances, respondent had no alternative but to direct the refund checks to be mailed to petitioners at the address of Berg & Allen. The regulation does not specify how the IRS is to determine the proper address. It merely states the check must be sent "direct to the claimant." In light of the information available to respondent on the returns and refund claims, we are satisfied in these cases respondent complied with the procedural regulation requiring refund checks be sent "direct to the claimant" since the refund checks were sent to the address reflected on the returns and claims for refunds. Petitioners complain respondent at some point became aware or should have become aware Berg was improperly cashing refund checks. Petitioners suggest respondent was more interested in a criminal prosecution of Berg than in assuring petitioners properly received their refunds. Thus, petitioners argue respondent could have prevented the refund checks from being improperly negotiated by Berg. *257 The problem with petitioners' argument is two-fold. First, petitioners failed to establish the IRS was aware of or should have been aware of Berg's scheme at the time the refund checks were mailed. Secondly, and more importantly, petitioners participated in the arrangement with Berg by: (1) signing the Federal income tax returns reflecting Berg & Allen's address, (2) allowing Berg & Allen to cash their checks, often acknowledging the process in writing; and (3) not complaining to respondent soon after the events occurred, thus tacitly approving the arrangement. The records kept by Berg & Allen were extensive. Each transaction with petitioners was documented. Cross references could be made in separate journals so the disposition of a particular petitioner's refund check could be traced. When a refund check was received by Berg & Allen, petitioners were usually required to sign a written authorization so the check could be negotiated. It was explained to each petitioner how the proceeds of the refund check were to be applied. The proceeds of the check were first applied toward the investment, including a commission to Berg, then to tax preparation fees to Berg & Allen, and *258 finally the balance was to be returned to each petitioner. In several instances respondent sent a check directly to Rivera. On those occasions, Rivera sent her uncashed refund check to Berg & Allen so it could deposit the check pursuant to the arrangement agreed to. In other situations petitioners actually endorsed the refund checks and allowed Berg & Allen to deposit the checks in the Firm's account. These circumstances illustrate the extent to which petitioners participated with Berg & Allen. It is clear petitioners believed they were making an investment which would generate substantial tax benefits. They now concede they are not entitled to the tax benefits claimed. Petitioners' real complaint is they have not received the benefits of the arrangement as promised by Berg & Allen. Having lost these tax benefits, petitioners cannot now blame respondent for having complied with the regulation by sending refund checks to the address reflected on their returns which they executed. Rivera has even less cause to complain since she actually received some of her refund checks; however, she chose to turn them over to Berg & Allen. We are thus satisfied respondent correctly computed *259 the deficiencies in these cases and that petitioners are not entitled to credits against such deficiencies in the amount of the refunds in question. In Terry v. Commissioner, 91 T.C. 85 (1988), respondent, pursuant to section 6402(c), intercepted the taxpayer's refund for the State of Washington for past due child support. We held the deficiency in that case was properly computed by disregarding the refund forwarded to the State of Washington. Thus, respondent complied with the Internal Revenue Code in application of the refund. The situation is the same here. The refund checks were sent to the address reflected on the returns and the claims for refund. Petitioners' argument concerning the validity of the powers of attorney must also fail. First, the sending of petitioners' refund checks to the addresses reflected on the return is not necessarily dependent on a power of attorney but rather the return itself, which was executed by the petitioners. Sec. 601.506(b), Statement of Procedural Rules, provides generally that the IRS will send a refund check to a representative acting under a power of attorney. However, this was not the basis for sending the refund *260 checks to Berg & Allen. The Berg & Allen address was listed as the tax return address. Secondly, to the extent the power of attorney might play a role in the sending of the taxpayer's refund, we hold the invalidity of a portion of the power of attorney does not necessarily invalidate the entire power of attorney. Section 601.502(c)(i), Statement of Procedural Rules, allows for "Receipt (but not endorsement and collection) of a check." Thus, the power to endorse and collect refund checks is not one of the enumerated acts a representative can perform on behalf of a taxpayer under the Statement of Procedural Rules. Procedural rules, however, do not have the force of law. Rosenberg v. Commissioner, 450 F.2d 529, 532-533 (10th Cir. 1971), affg. a Memorandum Opinion of this Court; Luhring v. Glotzbach, 304 F.2d 560, 563-565 (4th Cir. 1962); Cleveland Trust Co. v. United States, 421 F.2d 475, 581-582 (6th Cir. 1970); Cataldo v. Commissioner, 60 T.C. 522, 523 (1973). Procedures relating to powers of attorney are directory, not mandatory. Griffith v. Commissioner, T.C. Memo. 1988-445; Estate of Maceo v. Commissioner, T.C. Memo. 1964-46. *261 Thus, assuming the power of attorney is an essential link here, the inclusion of the power to endorse checks and collect refunds should not act to void all other acts provided for in the power of attorney. While the provisions of the power allowing Berg to endorse and collect the refund checks may not be valid, there is nothing in the record which would indicate other provisions of the power of attorney are invalid. Nor does the inconsistent treatment of the powers of attorney by IRS employees afford relief to petitioners. Petitioners' loss here was not caused by the IRS but rather by their continued relationship with Berg. Petitioners ratified the acts of their attorney-in-fact by allowing Berg to continue to act on their behalf. Petitioners' failure to complain about the receipt and negotiation of their refund checks is a further indication of the ratification of Berg's acts. The IRS proceeded in early 1981 to stop the flow of refund checks to Berg & Allen. The "pre-refund examination" was put into effect only after the IRS was satisfied Berg & Allen was preparing returns claiming improper deductions and credits and improperly negotiating refunds. Petitioners, who participated *262 in the arrangement with Berg, cannot be heard to complain that the IRS responded too slowly to stop the flow of refund checks. Based on the foregoing, respondent's determinations in his notices of deficiency are correct and petitioners are not entitled to offsets against the determined deficiencies in the amounts of the refunds in question. Grand Jury
Petitioners argue respondent improperly utilized Grand Jury information in the determination of the deficiencies and in subsequent proceedings. Petitioners suggest respondent should have the burden of proof to establish the deficiencies independent of Grand Jury information. Rule 6(e) of the Federal Rules of Criminal Procedure provides generally Grand Jury proceedings are secret. Bell v. Commissioner, 90 T.C. 878, 902 (1988); Graham v. Commissioner, 82 T.C. 299, 306 (1984), affd. 770 F.2d 381 (3d Cir. 1985). There are limited exceptions permitting disclosure under certain prescribed circumstances. Rule 6(e)(3)(C)(i), Federal Rules of Criminal Procedure. [6] Thus, we must decide whether *263 matters occurring before the Grand Jury in violation of Rule 6(e), Federal Rules of Criminal Procedure, were received and used by respondent for civil audit purposes, including the preparation of the notices of deficiency involved herein. At the outset we note many of the cases involving this issue involve situations where there are allegations the IRS improperly utilized Grand Jury information which formed a basis of the notice of deficiency. Thus, the Court is normally required to review what information was available to the agents of respondent who were conducting the examination of the returns and who were involved in the preparation of the notices of deficiency. The situation at bar is somewhat different. The substantive issue raised in these cases, whether petitioners are entitled to offsets against the determined deficiencies *264 because they did not receive their refund checks, is not an issue raised during the examination of the returns and described in the notices of deficiency. The deficiencies determined in these cases arise from petitioners' failure to prove their entitlement to claimed deductions and credits. The record reflects petitioners' failure to cooperate with agents of respondent, failure to reply to inquiries concerning entitlement to claimed deductions and credits. Nevertheless, we review the record to determine whether petitioners have in any way established an improper use of Grand Jury information by the IRS. Berg & Allen were continually under criminal investigation by the IRS from the mid-1970's. The IRS attempted to make contact with petitioners in 1981 and early 1982. The notices of deficiency were issued in April 1982, except for one notice to the Abesons issued in April 1981. In May 1981, the U.S. Attorney requested the IRS initiate a request for a Grand Jury investigation of Berg. Meanwhile the Criminal Investigation Division of the IRS was conducting an investigation at the same time as the civil examination. There is conflicting evidence in the record as to exactly when *265 the Grand Jury proceeding commenced. While there is testimony a special agent of the IRS appeared before the Grand Jury on September 30, 1981, there is other evidence indicating the Grand Jury did not commence until 1982 or 1983. [7]
Despite the confusion as to the commencement of the Grand Jury and the timing of IRS involvement, there is no evidence any Grand Jury information was available to or used by IRS agents who conducted the civil examination or prepared the notices of deficiency. In fact, the testimony and records of the IRS indicate those persons having access to Grand Jury information such as special agents did not reveal matters to agents in the Examination Division. The record is replete with memoranda and testimony showing IRS employees were taking special precautions to not reveal Grand Jury information to unauthorized persons. Thus, considering the lack of any evidence of improper use of Grand Jury information, *266 coupled with the nature of the adjustments herein, we find there was no improper use of Grand Jury information in the examination of the returns and in the preparation of the notices of deficiency involved in these cases. Failure to Comply with Discovery
Petitioners argue respondent withheld documents and failed to comply with discovery orders of the Court. Petitioners suggest that the Court should impose sanctions for his failure to comply. In contrast, respondent argues he has fully complied with all discovery orders of the Court. These cases have an extensive history of disagreement between counsel for the parties. We previously detailed the history of this disagreement. These cases were docketed before this Court in 1981 and 1982. Petitioners have failed to establish respondent did not comply with discovery orders and provide documents to petitioners. Petitioners' argument in this regard is similar to arguments made throughout this litigation. Petitioners have alleged various Government agencies engaged in a conspiracy to deny the Berg & Allen clients their procedural rights. In fact, the record reflects from the commencement of the examination of the tax returns *267 petitioners have been afforded appropriate procedural rights and it has been petitioners and/or their counsel who have failed to avail themselves of the opportunity to fully present their position. Respondent made his records available to petitioners and literally thousands of documents were available for review. With respect to Grand Jury documents, such documents only became available a few days prior to trial. We will not impose sanctions on respondent for failure to provide documents to which he did not have access, especially where petitioners had equal opportunity to seek access to those documents from third parties. Based on this background and record, there is no basis on which to impose sanctions on respondent. See Rosenfeld v. Commissioner, 82 T.C. 105 (1984); Marsh v. Commissioner, 62 T.C. 256 (1974). While petitioners do not argue they are entitled to documents as to which the Court upheld respondent's claim of privilege, some of these documents viewed in camera and initially withheld were later offered into evidence by petitioners. We assume petitioners' counsel either previously had these documents or acquired them when he received *268 Grand Jury documents just prior to trial. Conclusion
Based on the foregoing, we find for respondent. Due to concessions, Decisions will be entered under Rule 155. Footnotes
1. The following cases are consolidated herewith: Gregory H. Abeson and Arline H. Abeson, docket No. 14410-82, Stanley Downs and Janae Downs, docket No. 16381-82, Thomas A. Duffy and Ann D. Duffy, docket No. 16463-82, Robert Pease and S. Madalene Pease, docket No. 16504-82, and Delores P. Rivera, docket No. 18015-82.↩
2. All section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Initially seven dockets were set for trial; however, one docket was settled.↩
4. Attorney Gary R. Livingston previously filed an entry of appearance on Mar. 7, 1988.↩
5. See Wegge v. Egger, Jr., an unreported case ( C.D. Cal. 1984, 55 AFTR2d 85↩,738, 84-2 USTC par. 9753).
*. An additional $ 100 was paid by the Duffys directly.↩
*. These refunds were sent to Rivera at her home. Rivera forwarded the checks to Berg & Allen where they were deposited into the Firm's account. ** Not reflected by the record. *** The refund was not issued for this year due to a freeze. Ultimately, a check for $ 13,013.22 was issued in 1986. On advice of counsel, petitioner had not negotiated this check at the time of trial.↩
6. While counsel for respondent obtained an order from the U.S. District Court on June 9, 1988, permitting certain limited disclosure for purposes of trial, such order was obtained many years after the notices of deficiency were issued in these cases. Petitioners' counsel alleged he also had such an order; however, none was presented at trial.↩
7. In a letter to the U.S. Attorney from the Tax Division of the Department of Justice, it is indicated the Grand Jury was authorized on Feb. 3, 1982, while the same letter also indicates the Grand Jury investigation was authorized on Feb. 3, 1983.↩